Filed 8/7/23  P. v. Edwards CA5

<u>**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>        v.<br><br>MARLON DARNELL EDWARDS,<br><br>        Defendant and Appellant. | F083956<br><br>(Tulare Super. Ct. No. VCF300146)<br><br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Tulare County.  Nathan G. Leedy, Judge.

Byron C. Lichstein, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Darren K. Indermill, R. Todd Marshall, and Christopher J. Rench, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

## INTRODUCTION

Defendant Marlon Darnell Edwards appeals his conviction for first degree murder. Defendant asserts numerous arguments on appeal, including that due process was violated by the extended delay between the date of the crime in 1994 and the filing of the complaint in 2014. Defendant also argues he was denied constitutionally sufficient defense counsel, inadmissible hearsay testimony was admitted against him, and the prosecutor committed misconduct during closing argument. Lastly, according to defendant, the trial court erred by failing to conduct a hearing on his ability to pay fines and assessments, even though none was requested, and that recent amendments to the youthful offender law violate equal protection. Finding none of these arguments persuasive, we affirm defendant's conviction.

## PROCEDURAL SUMMARY

This case was first initiated by the filing of a felony complaint on May 16, 2014. Following a preliminary hearing at which defendant was held to answer, the Tulare County District Attorney filed an information on January 19, 2018, charging defendant with a single count for the murder of Mario Castaneda (Pen. Code, § 187, subd. (a)).[1] The count included special allegations defendant personally used a firearm in the commission of the crime (§ 12022.5, subd. (a)(1)) and had a prior murder conviction (§ 190.2, subd. (a)(2)).

On October 1, 2021, a jury found defendant guilty of first degree murder on count 1. The jury also found true the special allegation that defendant used a firearm in the commission of the murder, within the meaning of section 12022.5, subdivision (a)(1).

On February 16, 2022, the trial court sentenced defendant to an indeterminate term of life without the possibility of parole. Defendant was also ordered to pay a $10,000

---

[1] All further statutory references are to the Penal Code, unless otherwise indicated.

restitution fine, a $40 court operations assessment, and a $30 criminal conviction assessment.

Defendant timely filed his notice of appeal on February 16, 2022, the same date as his sentencing.

## FACTUAL SUMMARY

The facts presented at trial in this case were not extensive,[2] as many witnesses had trouble recalling the events due to the passage of almost 30 years between the date of the crime and the date of trial. The victim, Mario Castaneda, was found dead lying outside of his car on January 4, 1994, at an apartment complex, having been shot in the head and chest. A .22-caliber rifle, with a modified grip and an extended clip, was found a few days later outside the apartment complex by someone painting the building and was presumed to be the murder weapon. Nothing in the record indicates any further physical evidence was developed from the gun connecting it to the murder or to defendant.[3]

Earlier in the day on January 4, Castaneda had been drinking at his house with several friends, including Jose M., Vincent M., and Juan C. These individuals, along with various others, drank for many hours, first at Jose M.'s house, and then at Castaneda's.[4]

---

[2] Even though the evidence here was not overwhelming, defendant does not raise a sufficiency of the evidence claim on appeal. Even if he had, we would be compelled to review "the whole record in the light most favorable to the judgment" and then decide "whether it discloses substantial evidence ... such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Hatch* (2000) 22 Cal.4th 260, 272.) Because the court is not free to "ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt," but rather must inquire whether "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt," we doubt any such challenge would have been successful here. (*Ibid.*)

[3] A police officer testified he attempted to locate the owner of the gun, but was unable to do so, having traced it back to someone who claimed to have sold it at a truck stop in Las Vegas.

[4] Jose M. and Castaneda lived across the street from one another.

The main witness for the prosecution was Castaneda's friend Jose M. Jose M. testified as follows: after drinking throughout the day, Castaneda departed the house around 11:00 p.m., when he went with Jose M. to purchase drugs. Castaneda, Jose M., and a third person, probably Vincent M.,[5] went to a different apartment complex from the one Castaneda's body was eventually found, looking to buy drugs. Jose M. waited near the car while Castaneda went to talk with a man Jose M. identified as "Marlon."[6] Jose M. could not really hear the conversation, and the only exchange he was involved in was when Castaneda returned and told Jose M. he was leaving with Marlon, at which point Jose M. asked Castaneda if he could come. Jose M. testified he did not hear Castaneda and Marlon arguing.[7] Castaneda told Jose M. to wait at the apartment complex and left with Marlon in Castaneda's car. Eventually, after Castaneda did not return, Jose M. walked back to Castaneda's house, but did not find Castaneda there. After waiting around for a while, Jose M. walked back to the apartment complex he had been left at,

---

[5] There was equivocal testimony about whether a third person went with Jose M. and Castaneda to purchase drugs, and which person it was. Jose M. testified inconsistently about this. First, he said Vincent M. went with them. Later, he testified the third companion was actually Juan C. In a prior statement to police, Jose M. had said it was Vincent M. who went with them. Jose M. testified he had a drinking problem at the time of the murder.

Vincent M. denied having any memory of 1994 and denied knowing any of the other witnesses. However, police reports were introduced reflecting he had told police in prior interviews that he went with Jose M. and Castaneda to purchase drugs. Juan C. testified he did not leave to go anywhere with Castaneda that evening, except to the store to buy more beer.

[6] Jose M. testified he had known Marlon before the night in question, and Marlon used to come into the gym where Jose M. boxed. The night of the murder was not the first time they had met, and they knew each other from the neighborhood as well.

[7] The prosecution introduced evidence Jose M. had told police on a prior occasion he heard Castaneda arguing with Marlon over a drug debt, and Castaneda had attempted to trade some property in his car to settle that debt. Additionally, prior statements of Victor M. were introduced also reflecting Castaneda and this individual were arguing over a prior drug debt, and Castaneda was attempting to exchange property from the car for payment of this.

searching for Castaneda. According to Jose M., he saw the man he knew as Marlon when he arrived back at the apartment complex and asked where Castaneda was. Jose M. testified Marlon responded, "He tried to rob me. I put him to sleep." Jose M. then walked back home, upset and crying.

Jose M., however, could only equivocally identify defendant as the person he knew as "Marlon," with whom he saw Castaneda leave on the night in question. Jose M. said it had "[b]een so long, I just barely remember what he looks like, but yeah, he was African-American." When asked if he could identify defendant as the man he had seen Castaneda leave with, Jose M. stated, "I really can't remember. I knew what the guy looked like when we were growing up, but now when years go by, you know, it's hard to find out, but yeah, if I got close to the guy, I probably know who he is." After being allowed to approach defendant and asked again whether he could identify him as the man Jose M. knew as "Marlon," Jose M. stated, "I want to say it's this gentleman here, but like I said, a lot of people change over the years." Ultimately, Jose M. said, "I think that might be him there." A police detective was called to testify Jose M. had picked defendant out of a photo array at the time of the murder as the person with whom Castaneda had left.

The other witness called by the prosecution who was expected to be of significant importance was defendant's girlfriend at the time of the murder, Rosa C. Rosa C. was interviewed by a police detective in 2012 as a part of reopening the investigation and stated then she had visited defendant in jail in 1994 following his original arrest in relation to this case. In 2012, Rosa C. told the detective defendant had told her in 1994 that he and Castaneda started arguing after leaving together in the car, Castaneda "had been tweaking," and the two got into a fight once they reached their destination. At trial, however, Rosa C. testified she had no recollection about speaking to defendant at the jail in 1994. Rosa C. recanted her former comments to police detectives implicating defendant, explaining she was "under the influence of alcohol and drugs" and "was just

5.

talking a lot of falsehoods about [defendant] that weren't even true." She noted she was drunk when she spoke to the prior police investigator in 2012. According to Rosa C., "I was abusing alcohol and a lot of illicit drugs. I was hanging around with people who were tweakers like myself." Rosa C. testified she had stopped using drugs approximately a year and a half before the trial. The police detective who interviewed Rosa C. in 2012 testified he did not believe she was under the influence of drugs or alcohol at the time of the interview.

Defendant spoke with police in 1994 when contacted shortly after the murder. Defendant acknowledged he knew Castaneda and had previously been in his car. He also stated he had seen Castaneda earlier on the night he was killed, when defendant was at another apartment complex, colloquially named "Sin City," with defendant's cousin. No evidence was adduced at trial suggesting defendant made any inculpatory comments to police during the interview.

Given the delay between when the murder occurred and when charges were filed, several witnesses had passed away by the time of trial, including the forensic technician who collected evidence, the doctor who performed the autopsy, and the other medical examiner who testified at the preliminary hearing in lieu of the doctor who performed the autopsy. The latter's testimony from the preliminary hearing was read into the record at trial.

## DISCUSSION

### I.     The Trial Court Did Not Err in Denying Defendant's Motion to Dismiss Due to Prefiling Delay

Defendant's primary argument on appeal is that his due process rights were violated by the delay between the time of the crime and the time charges were filed against him. For the reasons that follow, we find defendant has not met his burden to demonstrate a due process violation occurred.

6.

## A.  *Standard of Review*

A trial court's ruling on a motion to dismiss for prefiling delay is reviewed under the abuse of discretion standard, and we are to "defer to any underlying factual findings if substantial evidence supports them."  (*People v. Cowan* (2010) 50 Cal.4th 401, 431 (*Cowan*).)  In reviewing whether an abuse of discretion has occurred, the appellate court considers all evidence before the court at the time the motion to dismiss was last made or renewed.  (*Ibid*. ["Because defendant last renewed his motion to dismiss during Mitzi Cowan's trial testimony, we will consider all of the evidence that was before the court up to that time"]; see also *People v. Mataele* (2022) 13 Cal.5th 372, 407 (*Mataele*) [considering evidence presented at trial, because the defendant moved posttrial for dismissal]; *People v. Jones* (2013) 57 Cal.4th 899, 922 (*Jones*).)  In this case, defendant moved for dismissal pretrial, and therefore we properly consider only the evidence available pre-trial in evaluating whether the trial court abused its discretion.  Nevertheless, even if the trial court had had the benefit of all the evidence presented at trial when making its ruling, we would still conclude defendant has not shown any abuse of discretion, because he cannot demonstrate prejudice.

## B.  *The Trial Court Did Not Err in Denying Defendant's Motion Because Defendant Failed to Show Prejudice*

Where there is prejudicial, unjustified delay between the time of the alleged crime and the time charges are initially brought by the state, the due process clauses of the Fifth and Fourteenth Amendments of the U.S. Constitution, and article I, section 7 of the California Constitution, protect a defendant.  (*Cowan*, *supra*, 50 Cal.4th at p. 430.)  Speedy trial rights are not implicated, "as those rights do not attach until a defendant has been arrested or a charging document has been filed."  (*Ibid.*; see also *Jones*, *supra*, 57 Cal.4th at p. 921.)

"A defendant seeking relief for undue delay in filing charges must first demonstrate resulting prejudice, such as by showing the loss of a material witness or

other missing evidence, or fading memory caused by the lapse of time." (*Jones, supra,* 57 Cal.4th at p. 921.) Critically, "[p]rejudice to a defendant from precharging delay is not presumed," as the "statute of limitations is usually considered the primary guarantee against overly stale criminal charges." (*Ibid.*; see also *Mataele, supra,* 13 Cal.5th at p. 406; *Cowan, supra,* 50 Cal.4th at p. 430.) Either a negligent or purposeful delay can result in a violation of due process; however, a greater showing of prejudice is required if the delay was "merely negligent." (*Jones,* at p. 921.) "If the defendant establishes prejudice, the prosecution may offer justification for the delay; the court considering a motion to dismiss then balances the harm to the defendant against the justification for the delay." (*Ibid.*; see also *Mataele,* at p. 406; *Cowan,* at p. 431.) However, "if the defendant fails to meet his or her burden of showing prejudice, there is no need to determine whether the delay was justified." (*Jones,* at p. 921; see also *Mataele,* at p. 406.) We apply California law here, as the California Supreme Court has repeatedly found the law concerning due process challenges to prefiling delays under the California Constitution is " 'is at least as favorable for defendant … as the law under the United States Constitution.' " (*People v. Cordova* (2015) 62 Cal.4th 104, 119; see also *Mataele,* at p. 406.)

Defendant primarily argues prejudice should be presumed, given the length of delay and the number of witnesses who testified to lacking a full memory. According to defendant, the U.S. Supreme Court has held "impairment of one's defense is the most difficult form of speedy trial prejudice to prove because time's erosion of exculpatory evidence and testimony 'can rarely be shown.' " (*Doggett v. United States* (1992) 505 U.S. 647, 655.) Therefore – in the speedy trial context – the Court has stated, "[W]e generally have to recognize that excessive delay presumptively compromises the reliability of a trial in ways that neither party can prove or, for that matter, identify." (*Ibid.*) Similarly, the Court has commented – again, in the speedy trial context – if "witnesses die or disappear during a delay, the prejudice is obvious," as it is when

"defense witnesses are unable to recall accurately events of the distant past," because memory loss is difficult to reflect in the record "because what has been forgotten can rarely be shown." (*Barker v. Wingo* (1972) 407 U.S. 514, 532.)

However, to whatever extent prejudice may be presumed in speedy trial jurisprudence,[8] there is no such presumption in relation to due process challenges based on pre*filing* delays. This is a critical difference in these two areas of the law, and our Supreme Court has been repeatedly clear there is *no* presumption of prejudice in the prefiling delay context. (*Jones*, *supra*, 57 Cal.4th at p. 921 ["Prejudice to a defendant from precharging delay is not presumed"]; see also *Mataele*, *supra*, 13 Cal.5th at p. 406 [same]; *People v. Abel* (2012) 53 Cal.4th 891, 908–909 [same]; *People v. Nelson* (2008) 43 Cal.4th 1242, 1250 [same].) Different interests are implicated by delays prior to charging than are at issue after charging. After charges have been filed, speedy trial rights are designed to protect at least three separate interests of the accused's: "(i) to prevent oppressive pretrial incarceration; (ii) to minimize anxiety and concern of the accused; and (iii) to limit the possibility that the defense will be impaired." (*Barker v. Wingo*, *supra*, 407 U.S. at p. 532, fn. omitted.) Of those, only the last applies to a delay prior to filing.

More importantly, the applicability of the statute of limitations distinguishes these two areas of jurisprudence. As noted, the statute of limitations is "the primary guarantee against overly stale criminal charges." (*Jones*, *supra*, 57 Cal.4th at p. 921.) However, because the statute of limitations requires only an indictment or information be *filed*

---

[8] It bears noting the presumption is not sufficient even in speedy trial challenges. The Supreme Court has said "such presumptive prejudice cannot alone carry a Sixth Amendment claim without regard to the other *Barker* criteria," namely, whether delay was uncommonly long, whether the government or defendant is to blame for the delay, and whether the defendant timely asserted his speedy trial rights. (*Doggett v. United States*, *supra*, 505 U.S. at p. 656.) Thus, defendant must still affirmatively demonstrate a Sixth Amendment violation, even where the delay between charging and trial is lengthy and the prejudice is presumed.

within a prescribed amount of time, it obviously offers no protection against delay once a defendant has been charged.  (§ 804, subd. (a).)  It is therefore logical to provide heightened protections in the speedy trial context since the primary protection against undue delay – the statute of limitations – no longer protects a defendant at all once the information or indictment has been filed.  Prior to the filing of charges, the statute of limitations retains its full force and effect.

Regardless of the reasons, it is clearly settled law no presumption of prejudice applies to precharging delays.  And defendant has not demonstrated any particular prejudice due to the delay in this case, even considering all of the evidence developed at trial.  Having failed to show prejudice considering this expanded universe of evidence, defendant cannot show the trial court abused its discretion in denying his motion with far *less* evidence in front of it.

While defendant identifies many places in the record where witnesses stated they could not remember something, a mere lapse in memory or unavailability of a witness is not itself sufficient to establish prejudice.  (See *Mataele*, *supra*, 13 Cal.5th at p. 407 [no prejudice demonstrated by unavailability of lead investigator at trial, because defendant was able to question other pertinent witnesses about information investigator would have offered]; *Jones*, *supra*, 57 Cal.4th at p. 922 [noting with approval trial court's observation that "in a large case with many witnesses, some delay, and thus the possibility that some memories may fade, is inevitable"].)  Rather, defendant must show the lapse in memory or testimony related to a critical, or at least material, piece of evidence in the trial.  (See *Cowan*, *supra*, 50 Cal.4th at p. 433 [rejecting prejudice argument because "the witnesses' ability to identify the items at trial was not critical"]; *People v. Sahagun* (1979) 89 Cal.App.3d 1, 23–24 [finding "vague, general and conclusory statements" insufficient to carry burden of proof on prejudice].)  Further, "prejudice from fading witness memories due to passage of time is diminished where contemporaneous police reports exist that

10.

may be introduced into evidence or used to refresh the witness's recollection." (*Mataele*, at p. 409.)

Additionally, defendant must show any dissipation in memory on which he intends to rely was caused by the passage of time, and not by other factors, such as drug or alcohol use. (See *Jones*, *supra*, 57 Cal.4th at p. 923 [noting one witness "was a habitual drug user, and the trial court reasonably concluded her memory would not have been the best in any case"]; *Cowan*, *supra*, 50 Cal.4th at p. 432 [observing if defendant had lost his ability to recall much earlier "due to drug use or some other cause," then "any claim that he would have been able to construct an alibi defense had the prosecution commenced sooner is speculative"]; *People v. Butler* (1995) 36 Cal.App.4th 455, 464 ["Appellant's memory was impaired, but the impairment appears to have had nothing to do with the passage of time, but was the result of extended ingestion of alcohol. Moreover, it appears that he had no better recall of the relevant events shortly after they occurred than he had at trial"]; *People v. Sahagun*, *supra*, 89 Cal.App.3d at p. 24 [noting defendant could not show witnesses or evidence "would have been available had criminal proceedings been reinstituted within a short time – that is, that the loss of evidence and unavailability of witnesses was caused by the prosecutorial delay"].)

In this case, defendant first argues prejudice is shown by the fact that "nearly every fact witness … commented on how difficult it was to remember" specific details of the events that occurred on the night of the murder, because of the passage of time. This, however, does little, if anything, to establish prejudice. Defendant does not offer any kind of explanation about what was missing from the witnesses' testimony that might have been helpful to the defense of this case. As courts have noted, delay is somewhat atypical among alleged deprivations of constitutional rights, insofar as its prejudice to defendant is often questionable. Delay is "not an uncommon defense tactic," and can benefit the defendant as much as, and sometimes more than, it benefits the prosecution. (*Barker v. Wingo*, *supra*, 407 U.S. at p. 521.) Indeed, in this case, defendant's primary

11.

argument during closing was that the jury should mistrust various witnesses and the prosecution's case in general due to the amount of time between the murder and trial. Defendant does not establish prejudice merely by noting the passage of time caused some witnesses to fail to recall certain details, without explaining how those lapses in memory may have impacted the jury's finding. Further, as referenced above, contemporaneous police reports reflect the prior statements of many of these witnesses, therefore minimizing the prejudice from these faded memories. (*Mataele*, *supra*, 13 Cal.5th at p. 409.) Further, defendant has not identified any indication these witnesses would have been better able to recall events shortly after their occurrence. Several witnesses also acknowledged having drug and/or alcohol problems that impacted their memory, suggesting their memories would not have been appreciably better had the trial proceeded closer in time to the date of the murder.

Second, defendant points to the death of three witnesses – the doctor who performed the autopsy; another doctor who reviewed the autopsy report and testified at the preliminary hearing; and a crime laboratory technician who collected evidence, including the murder weapon – as establishing prejudice. Again, however, defendant in no way explains what information was missing or might have come into evidence if these individuals had testified, and how that information would have assisted his defense. The sole evidence introduced through the medical experts was that Castaneda died by multiple gunshot wounds to the head and chest, a fact which defendant did not dispute. No evidence was introduced at trial establishing any connection between defendant and the murder weapon – the subject on which the technician might have testified – and this was emphasized repeatedly by the defense in closing when telling the jury the government "need[ed] to present physical evidence to you to convince you beyond a reasonable doubt," and there was "not a scrap, not one tiny piece of physical evidence that links [defendant] to this crime." The deaths of these three witnesses here, if

anything, seem to have aided defendant, not harmed him.  Defendant does not establish prejudice simply by showing these witnesses were unavailable to testify at trial.

Lastly, defendant points to his inability to prepare an adequate defense as prejudice because he does not recall the events surrounding the day of the murder, was not in contact with individuals who might have been able to provide an alibi, and had lost or destroyed other materials which might have provided an alibi.  However, the California Supreme Court has previously held this does not constitute prejudice where a defendant was aware he was a suspect at or near the time of the alleged crime, and thus "had an incentive to record any exculpatory information he had regarding his whereabouts, the property, or the identity of alibi witnesses." (*Cowan*, *supra*, 50 Cal.4th at p. 432, fn. omitted.)  In this case, defendant was brought in for questioning and was aware he was a suspect within a month of the murder.  Moreover, police records identify defendant's alibi, insofar as he told police he was with his cousin on the evening of the murder.  At another point, defendant also told police he was with his girlfriend, Rosa C., on the evening in question.  Defendant's cousin did not testify at trial, and defendant points to nothing in the record showing this cousin, who could have provided an alibi for him, was unavailable due to the passage of time.  Because defendant's cousin was not called as a witness, there is also nothing in the record indicating a lapse in memory prevented him from providing defendant with an alibi.  Meanwhile, Rosa C. did testify at trial.  However, she was never asked whether she could provide an alibi for defendant, or whether she was with defendant on the night in question.  Instead, the entirety of her testimony focused on a statement she made to investigators in 2012 inculpating defendant, and her subsequent recantation of that statement at trial.  There is nothing about her testimony showing she was unable to provide an alibi due to the passage of time.  Therefore, prior precedent controls, and these general declaratory statements from defendant do not establish prejudice.  In sum, defendant has not shown how he was prejudiced here.  " '[I]f the defendant fails to meet his or her burden of showing

13.

prejudice, there is no need to determine whether the delay was justified.' " (*People v. Bracamontes* (2022) 12 Cal.5th 977, 989 [quoting *Jones*, *supra*, 57 Cal.4th at p. 921]; see also *Mataele*, *supra*, 13 Cal.5th at p. 409; *People v. Abel*, *supra*, 53 Cal.4th at p. 909.) We follow the direction of our Supreme Court, and do not address defendant's other arguments that the prosecution's delay was not justified by investigative need, since defendant has not established prejudice. Having failed to establish prejudice even on the expanded record we consider here, we conclude the trial court did not abuse its discretion in denying defendant's pretrial motion.

## II. Defense Counsel Was Not Constitutionally Ineffective in Relation to Alternative Perpetrator Evidence

The U.S. Constitution requires not only that a person charged criminally be allowed an attorney to represent them, but also that he or she receive "effective assistance of counsel" by having an attorney who will render "adequate legal assistance" to ensure a fair trial. (*Strickland v. Washington* (1984) 466 U.S. 668, 686 (*Strickland*).) A claim of constitutionally ineffective assistance of counsel requires two showings:

> "First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." (*Id.* at p. 687.)

A similar showing is required to demonstrate constitutionally ineffective assistance under article I, section 15, of the California Constitution. (*People v. Ledesma* (1987) 43 Cal.3d 171, 215.) Defendant bears the burden of establishing trial counsel was constitutionally inadequate. (*People v. Lucas* (1995) 12 Cal.4th 415, 436.)

The required showing is a high bar for defendant to meet. (*Harrington v. Richter* (2011) 562 U.S. 86, 105.) Establishing deficient performance requires showing "counsel's representation fell below an objective standard of reasonableness."

14.

(*Strickland*, *supra*, 466 U.S. at p. 688.)  Trial counsel's performance must be reviewed by the judiciary in a "highly deferential" manner.  (*Id.* at p. 689.)  "Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.' "  (*Ibid.*)

Further, prejudice must be shown.  "The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  (*Strickland*, *supra*, 466 U.S. at p. 694.)  "A reasonable probability is a probability sufficient to undermine confidence in the outcome."  (*Ibid.*; see also *People v. Ledesma*, *supra*, 43 Cal.3d at pp. 217–218.)  "When a defendant challenges a conviction, the question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt."  (*Strickland*, at p. 695.)

Here, again, defendant cannot establish prejudice, even assuming there was constitutionally ineffective counsel, which we do not find.  Defendant argues defense counsel was constitutionally ineffective for failing to follow up on the testimony of witness Melissa A.  Melissa A. was a percipient witness who testified to finding Castaneda's body when she went out to retrieve the mail.  Defendant's claim of ineffective assistance rests on the failure to elicit testimony about the statement Melissa A. gave the police when interviewed at the time of the murder.  According to defendant's offer of proof, the police report reflected that, prior to checking the mail but after she heard gunshots, Melissa A. looked out the bedroom window and saw a white, four-door economy car which she had seen previously at the apartment complex pull up and honk twice.  Two people got into the car, one of whom was 5 feet 9 inches tall, stocky in build, and wearing a "poofed-up beanie" and dark clothing.  Melissa A. could not identify the race of either of these people because it was dark.  Melissa A. purportedly told police

15.

these unidentified people were near where Castaneda was lying, would have been able to see the body, and may have possibly been involved with the crime.

The information contained in this police report was of marginal utility at best and would not have benefitted defendant if introduced.  Indeed, while the People argue the statement was equivocal, and would have had little value because it could be consistent with either theory of the case, it seems to us slightly more likely to be inculpatory, not exculpatory.  Defendant himself was 5 feet 9 inches tall.  Therefore, the jury would have been told Melissa A. saw two people fleeing the scene, one of whom was the same height as defendant.  While far from a positive identification, it is not information likely to make the jury *less* inclined to find defendant guilty.  There is, therefore, no prejudice from this alleged failure of trial counsel.[9]

## III.    The Trial Court Did Not Err in Admitting Hearsay Testimony

Defendant next argues the trial court erred in admitting certain hearsay testimony, because the prosecution did not give the witness at issue – Vincent M. – the opportunity to explain the statement attributed to him in the police report.  The People argue this was unnecessary because he remained subject to recall.  The People are correct.

The Evidence Code states "[e]vidence of a statement made by a witness is not made inadmissible by the hearsay rule if the statement is inconsistent with his testimony at the hearing and is offered in compliance with [Evidence Code] Section 770."  (Evid. Code, § 1235.)  Unless the "interests of justice otherwise require," extrinsic evidence of a prior inconsistent statement by a witness shall be excluded unless either "[t]he witness was so examined while testifying as to give him an opportunity to explain or to deny the statement" or "[t]he witness has not been excused from giving further testimony in the

---

[9] For similar reasons, defendant cannot show his attorney's performance was deficient.  It was reasonable for trial counsel to elect not to follow through on introducing evidence which would, at best, be of equivocal benefit and which at worst might further inculpate his client.

action." (Evid. Code, § 770, subds. (a)–(b).) As the Supreme Court has explained, "[a]n out-of-court statement by a witness that is inconsistent with his or her trial testimony is admissible to establish the truth of the matter asserted, so long as the witness has been given an opportunity while testifying to explain or deny the statement *or is still subject to recall*." (*People v. Johnson* (2018) 6 Cal.5th 541, 583, italics added; see also *People v. Chism* (2014) 58 Cal.4th 1266, 1294.)

The mere failure of a witness to recall a prior event is not inconsistent with the witness's prior statement describing that event. (*People v. Ledesma* (2006) 39 Cal.4th 641, 712; *People v. Rios* (1985) 163 Cal.App.3d 852, 864 ["[T]he appellate courts have consistently applied the rule set forth in *People v. Sam* [(1969) 71 Cal.2d 194] there is no 'testimony' from which an inconsistency with any earlier statement may be implied when the witness honestly has no recollection of the facts"].) That said, when the witness's " 'claim of lack of memory amounts to deliberate evasion, inconsistency is implied.' " (*People v. Ledesma*, at p. 712.) " 'As long as there is a reasonable basis in the record for concluding that the witness's "I don't remember"' statements are evasive and untruthful, admission of his or her prior statements is proper.' " (*Ibid.*; see also *Mataele*, *supra*, 13 Cal.5th at p. 415.)

In this case, Vincent M. testified he did not remember anything about January 4, 1994, the date of the murder. However, Vincent M. also testified he did not remember any part of January 1994, or any part of the entire year of 1993. When asked what the first memory he had was, he replied, "I don't have any memory of anything right now." He then commented, "I don't even want to make any statements at this time." He testified he did not know anyone named Mario Castaneda. He claimed he could not remember a single thing from 1994. Additionally, prior to this testimony, the Court had conferred with both counsel, and said, "I'm going to assume you want your witnesses subject to recall unless you tell me otherwise," to which both the prosecutor and defense counsel affirmatively replied, "Yes."

The prosecution then called Ken S., a retired detective with the Visalia Police. Ken S. testified he interviewed Vincent M. on April 25, 2012, as part of his reopening of the murder investigation. According to Ken S., Vincent M. said he knew Castaneda, as well as Jose M. Vincent M. also said he was present at Castaneda's home on January 4, 1994, and drove with Castaneda and Jose M. to an apartment complex to purchase drugs. When they arrived, Vincent M. told Ken S. he saw Castaneda speak to a black male while the two were out of earshot. Castaneda and this black male got into a "heated argument over some past debt that was already owed for some rock cocaine," according to Vincent M.'s prior statement. Vincent M. said Castaneda and the black male then drove away, leaving Vincent M. and Jose M. behind, according to Ken S.

The trial court found Vincent M.'s testimony to be evasive and disingenuous, commenting at one point, "I think a perfect example of a nongenuine failure of recollection was [Vincent M.] who took the stand and claimed to really not remember anything whatsoever. I found his claims to be totally noncredible." This determination was reasonable. Defendant does not argue otherwise.

Rather, defendant's focus is on whether Vincent M. was questioned in detail about his prior statement so as to give him a sufficient opportunity to explain it. Defendant notes caselaw saying, "[t]he proper and usual procedure is to ask the impeaching witness the direct question whether the alleged statements were made at the time and under the circumstances specified." (*People v. Abair* (1951) 102 Cal.App.2d 765, 770–771.) However, defendant's argument ignores the plain text of the statute, which requires *either* directly examining the witness so "as to give him an opportunity to explain or to deny the statement" *or* making sure the witness "has not been excused from giving further testimony in the action." (Evid. Code, § 770.) The reason for the second part of the statute is obvious: since Vincent M. remained subject to recall, *defendant* could have recalled him and asked him about the statement attributed to him by Ken S., allowing Vincent M. the opportunity to explain it. Therefore, it was unnecessary for the

18.

prosecution to afford him the opportunity to do so during his testimony. Vincent M. clearly remained subject to recall. Defendant simply chose not to recall him.

The authority on which defendant relies for his argument is wholly unpersuasive. Several of the cases predate Evidence Code section 770, which is the operative statute here and was enacted in 1965. (See *People v. Sykes* (1955) 44 Cal.2d 166, 172; *People v. Abair*, *supra*, 102 Cal.App.2d at pp. 770–771; *People v. Malicoat* (1949) 89 Cal.App.2d 742, 745.) Of the opinions cited which were issued after section 770 was enacted, none of them note the witness was available to be recalled. *People v. Alexander* (2010) 49 Cal.4th 846, specifically observed the relevant witness "was excused at the end of her testimony and was therefore not provided an opportunity to explain or deny that statement." (*Id.* at p. 909.) *People v. Garcia* (1990) 224 Cal.App.3d 297, simply does not discuss whether the witness in question was excused or subject to recall. However, because the extensive factual analysis by that court, see *id.* at pages 300 through 305, would have been completely superfluous if the relevant witness *were* subject to recall, we must presume she had been excused. And in *Bossi v. State of California* (1981) 119 Cal.App.3d 313, the trial testimony was a videotaped deposition, and the prior inconsistent statement was from a second, still earlier deposition. (*Id.* at p. 324.) The court in *Bossi* specifically noted the exception for prior inconsistent statements where the witness has not been excused from giving further testimony, and then observed this was "a condition which obviously could not be met in this case." (*Id.* at p. 324, fn. 6.)

In sum, the trial court did not err in admitting Vincent M.'s prior inconsistent statements. He remained subject to recall after his prior inconsistent statements were introduced to the jury.

## IV. The Prosecutor Did Not Violate Due Process with Improper Argument

Defendant next argues the prosecution violated due process by the prosecutor's improper argument during closing arguments. Specifically, defendant points to two issues during the prosecutor's closing arguments: (1) the prosecutor purportedly

misstated the facts when he suggested Rosa C. testified defendant told her he had a dispute with Castaneda about money; and (2) the prosecutor inappropriately vouched for the prosecution's case by telling the jury the delay in prosecuting the case was due to new evidence that was only recently available.

### A. *Applicable Law*

As our Supreme Court has noted, the standards " 'governing review of misconduct claims are settled.' " (*People v. Gonzales* (2012) 54 Cal.4th 1234, 1275 (*Gonzales*); see also *People v. Smithey* (1999) 20 Cal.4th 936, 960.) "A prosecutor who uses deceptive or reprehensible methods to persuade the jury commits misconduct, and such actions require reversal under the federal Constitution when they infect the trial with such unfairness as to make the resulting conviction a denial of due process." (*Gonzales*, at p. 1275 [internal quotation marks omitted].) State law holds " ' "a prosecutor who uses such methods commits misconduct even when those actions do not result in a fundamentally unfair trial." ' " (*Ibid.*) " ' "In order to preserve a claim of misconduct, a defendant must make a timely objection and request an admonition; only if an admonition would not have cured the harm is the claim of misconduct preserved for review." ' " (*Ibid.*) If a defendant shows misconduct has occurred, he must still show prejudice, by showing " 'a reasonable likelihood the jury understood or applied the complained-of comments in an improper or erroneous manner.' " (*People v. Brown* (2003) 31 Cal.4th 518, 553; see also *People v. Smithey,* at p. 960.) Even where misconduct is shown, " 'we "do not lightly infer" that the jury drew the most damaging rather than the least damaging meaning from the prosecutor's statements.' " (*People v. Brown*, at pp. 553–554.) Generally speaking, courts assume "the jury followed the court's instructions and not the argument of counsel," which includes, as in this case, a direction that the argument of counsel is not evidence. (*People v. Valdez* (2004) 32 Cal.4th 73, 113–114, fn. 14.)

**B.** *Rosa C.'s Testimony*

Rosa C. was defendant's girlfriend in 1994. As discussed above, while at trial, Rosa C. disavowed most of her prior statements to police, made in 2012, wherein she told a police detective she had visited defendant at the Tulare County Jail in 1994, where he confessed to her that he had indeed met with Castaneda on the night of the murder and the two had gotten into a conflict. Specifically, Rosa C. said defendant told her Castaneda "had been tweaking" and the two "fought" and "things had gotten out of hand."

During argument, the prosecutor made statements indicating Rosa C.'s prior statement was the two argued "over money." The prosecutor stated this coincided with Jose M.'s testimony and Vincent M.'s prior statements to police that the argument was about money, and because these witnesses were independent, there was no way it could be a coincidence. However, defendant notes Rosa C.'s prior statements to police did not specifically refer to money.

Defense counsel did not object to these statements during closing arguments. Failing to object forfeits any challenge to the propriety of these comments. (*People v. Redd* (2010) 48 Cal.4th 691, 734.) In any event, we would find this claim also fails on the merits. Even assuming this amounted to prosecutorial misconduct, we cannot find the jury applied the comments in an erroneous manner. The jury was instructed on several occasions that the arguments of counsel were not evidence. There is no reason to believe, especially given the limited nature of the claimed misstatement here, that it caused the jury to fail to follow its instructions and believe what counsel represented the facts to be rather than rely on its own understanding of the facts.

Defendant also includes a general claim without substantial analysis that any forfeiture amounts to its own constitutional violation because defense counsel rendered ineffective assistance of counsel by failing to object during closing argument. This argument is unavailing. In reviewing such claims, we give significant deference to trial

counsel's reasonable tactical decisions, and " 'strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.' " (*People v. Lucas*, *supra*, 12 Cal.4th at p. 437 [quoting *Strickland*, *supra*, 466 U.S. at p. 689].)  We do not think it falls outside the realm of reasonable professional assistance to elect not to object to this statement, even if it was a misstatement.  Trial counsel may well have wished not to appear to the jury to be quibbling over the prior statements of Rosa C., given her wholehearted recantation.  Relatively minor objections would have called more attention to Rosa C.'s prior statements and suggested to the jury defendant was concerned the jury would believe the prior statements.  It was reasonable for trial counsel to rely on Rosa C.'s complete recantation of these prior statements at trial and hope the jury would simply disregard her prior statements entirely, rather than wade into the relative minutiae of those statements and therefore cause the jury to focus on them more.

**C.** ***Improper Vouching***

Defendant also argues the prosecutor inappropriately vouched for the People's case.  Specifically, defendant points to the following portions of the rebuttal argument as problematic:

> [Prosecutor]:  The 30-year delay in filing this case is because we did not have enough evidence at the initial filing [of] the case when the case was submitted.  Some years later, we did receive further evidence that allowed us to file this case.
>
> This case was filed in 2014, has been set for trial several times, no less than six times, in fact, and has been continued.  So there are valid reasons for the delay in the filing of this case or the trial in this case.
>
> Now, Mr. Edwards, we're not strapping a parachute to his back and pushing him out of a plane.  He put the parachute on his own back and jumped out of the plane is what he did, okay.  He just wants you to catch him at the bottom.  He made his decision.
>
> The defense can attack the investigation.  They can do that all they want.  The fact is don't get away—focus on the coincidence—

[Defense Counsel]: Your Honor, I'm sorry, I'd like to object. Can we approach, please?

THE COURT: Come on up.

(Whereupon, an off-the-record bench discussion was had.)

[Defense Counsel]: The objection is sustained, your Honor?

THE COURT: Yes. [¶] … [¶]

[Prosecutor]: So finally, blaming anyone other than Marlon Edwards in this case just doesn't make sense. It doesn't hold water. You can say oh, but you didn't check – you didn't rule this person out. You didn't prove this person not guilty beyond a reasonable doubt. Well, that's not what we do. We go through our investigation. We gather our evidence. We make a determination, and we either file or we don't file from there.

In this case, we didn't have the evidence in the beginning. We had the evidence further on. We made our filing decision at that time, and that's why.

[Defense Counsel]: Your Honor, I've got to object again.

THE COURT: Sustained, counsel. Move on.

[Prosecutor]: I'm done.

Even assuming the first objection reflected above was indeed related to the prosecutor's comments about the delay in filing,[10] there is nothing apparent to complain of here. Defense counsel objected to these arguments, the trial court sustained the objections and directed the prosecutor to move on, and the prosecutor moved on. Defendant did not request any admonition to the jury. " ' "In order to preserve a claim of

---

[10] There is no record of what objection was made or what was discussed at the bench conference here. Further, the objection did not immediately follow the prosecutor's comments about the delay in filing, making it less obvious that that is what drew the objection. Of course, if defense counsel failed to object to the prosecutor's arguments in closing on this ground, that issue is forfeited on appeal. (*People v. Redd*, *supra*, 48 Cal.4th at p. 734.) We will, however, assume for the sake of argument that defense counsel's first objection was indeed related to what defendant characterizes as prosecutorial vouching.

23.

misconduct, a defendant must make a timely objection and request an admonition; only if an admonition would not have cured the harm is the claim of misconduct preserved for review." ' " (*Gonzales*, *supra*, 54 Cal.4th at p. 1275; see also *People v. Zambrano* (2004) 124 Cal.App.4th 228, 237.) Defendant does not argue a request for an admonition would have been futile, see *People v. Zambrano*, at p. 237, and indeed, since the court sustained the objections, in all likelihood, it would have given an admonition if requested. Moreover, defendant makes no argument here – and made no argument below – that no admonition could have cured the harm caused by the prosecutor's objectionable arguments. Defendant has not preserved this issue for review.

Defendant again makes a brief, general argument that, if forfeiture applies, it must reflect trial counsel's constitutionally ineffective representation. Again, we do not find this argument persuasive. Trial counsel's approach appears reasonably tactical: defense counsel objected to these arguments and the objection was sustained, and rather than ask for an admonition which would have cured any concerns, sought to use it as a basis to move for a mistrial.[11] Even if being granted a mistrial was somewhat unlikely, it may have appeared to defense counsel to be the sounder strategic decision: following a mistrial, the prosecution would have been heavily incentivized to offer a beneficial plea deal or even drop the charges altogether, considering how difficult it was to try a case this old. We do not find defense counsel's choice to pursue a motion for mistrial instead of

---

[11] Defendant does not argue the trial court erred in failing to declare a mistrial. Nevertheless, even if he had, it is not likely this would have been persuasive. "A trial court should grant a mistrial only when a party's chances of receiving a fair trial have been irreparably damaged, and we use the deferential abuse of discretion standard to review a trial court ruling denying a mistrial." (*People v. Bolden* (2002) 29 Cal.4th 515, 555; see also *People v. Jenkins* (2000) 22 Cal.4th 900, 986 [" 'Whether a particular incident is incurably prejudicial is by its nature a speculative matter, and the trial court is vested with considerable discretion in ruling on mistrial motions' "].) Defendant does not explain here and did not explain below why the harm caused by these arguments could not be cured by an admonition or instruction to the jury.

24.

requesting an admonition as falling outside of the " 'wide range of reasonable professional assistance.' " (*People v. Lucas*, *supra*, 12 Cal.4th at p. 437.)

**V.     The Trial Court Did Not Err by Failing to Conduct a Hearing on Defendant's Ability to Pay Fines or Assessments When Defendant Failed to Raise the Issue**

Defendant argues the trial court erred by imposing fines and assessments without first conducting a hearing on his ability to pay. Defendant acknowledges these fines and assessments were not objected to in the trial court, and therefore any claims of error would typically be forfeited. However, according to defendant, these fall "within the 'narrow exception' to the forfeiture rule made for a so-called unauthorized sentence or a sentence entered in excess of jurisdiction." (*In re Sheena K.* (2007) 40 Cal.4th 875, 886–887 (*Sheena K.*).) This exception allows certain "pure question[s] of law" to be reviewed even if forfeited. (*Id.* at p. 887.) The Court, in *Sheena K.*, noted "[a]n obvious legal error at sentencing that is 'correctable without referring to factual findings in the record or remanding for further findings' is not subject to forfeiture." (*Ibid.*)

Specifically, in *Sheena K.*, the defendant objected to a condition of probation preventing her from associating with anyone disapproved of by her probation officer. (*Sheena K.*, *supra*, 40 Cal.4th at p. 880.) Without a requirement that the defendant *know* the person was disapproved of by the probation officer, she argued the condition was unconstitutionally vague. (*Ibid.*) The Court found "a challenge to a term of probation on the ground of unconstitutional vagueness or overbreadth that is capable of correction without reference to the particular sentencing record developed in the trial court *can* be said to present a pure question of law." (*Id.* at p. 887.) Our Supreme Court thereafter upheld the Court of Appeals' discretionary decision to review the forfeited issue. (*Id.* at p. 887, fn.7.)

This circumstance is meaningfully distinct from the present case. Defendant's current challenge is based on *People v. Dueñas* (2019) 30 Cal.App.5th 1157 (*Dueñas*). In *Dueñas*, the defendant was an indigent and homeless mother of young children, who

pleaded no contest to driving with a suspended license and was placed on probation and ordered to pay $220 in fines and fees.  (*Id*. at p. 1160.)  The court further ordered, if fines or fees remained at the end of probation, the "amount due would go to collections without further order of the court."  (*Ibid.*)  The Court of Appeal held imposing fees in that circumstance, with no consideration of the fact that the defendant could not pay them, was tantamount to imposing additional punishment merely because the defendant was poor.  (*Id*. at pp. 1166–1168.)  That court found imposing mandatory court fees "upon indigent defendants without a determination that they have the present ability to pay violates due process under both the United States Constitution and the California Constitution."  (*Id.* at p. 1168, fn. omitted.)

Our Court has been previously divided on the issue of forfeiture of a *Dueñas*-type objection.  (See *People v. Montes* (2021) 59 Cal.App.5th 1107, 1116–1117.)  Different panels of this Court have sometimes found *Dueñas* issues were not forfeited when they were not raised in the trial court, at least where there was no opportunity to do so because *Dueñas* had not yet issued at the time an objection would have been timely made.  (See, e.g., *People v. Montes*, at pp. 1119–1121; *People v. Son* (2020) 49 Cal.App.5th 565, 596–598.)  Alternatively, other panels of this court have found on several occasions that failure to object below forfeits the claim.  (See, e.g., *People v. Lowery* (2020) 43 Cal.App.5th 1046, 1053–1054; *People v. Aviles* (2019) 39 Cal.App.5th 1055, 1073–1074.)  In both cases, our court has been clear this inquiry is inherently different from the question in *Sheena K.*, because it necessarily requires evaluation of a particular individual's financial situation and therefore is fact dependent and not a pure question of law.  The former set of panels remanded the issue for further factfinding by the trial court.

In this case, defendant was sentenced in February 2022, more than three years after *Dueñas* was issued.  The logic of prior decisions such as *Montes* and *Son* was predicated on defendant's inability to foresee a change in the law, which therefore

excused any forfeiture. Here, prescience was unnecessary: the decision in *Dueñas* had been out for several years. In this circumstance, we find defendant forfeited any objections to the fees and fines imposed by failing to raise such issues in the trial court at the time of sentencing.

Here again, defendant argues without detail that counsel must have been ineffective under *Strickland*, to the extent of any forfeiture. We do not find the Sixth Amendment's right to counsel has been violated here. Defendant points to nothing in the record demonstrating his inability to pay a fine or fee. He does not indicate he is unable to work while incarcerated. Wages in California prisons currently range between $12 and $56 per month. (Cal. Code Regs., § 3041.2, subd. (a)(1).) Half of these wages will be deducted to be paid towards any restitution fine. (§ 2085.5, subd. (a); Cal. Code. Regs., § 3097, subd. (f).) It is not clear from this that defendant will be unable to pay back his restitution fine; indeed, if he earns $56 per month, the restitution fine will be paid in less than 15 years, before defendant has reached the customary age of retirement. In short, defendant has not demonstrated that, had his attorney raised this issue in the trial court, a different outcome is reasonably probable.

## VI.    The Trial Court Did Not Violate Equal Protection by Failing to Conduct a Youthful Offender Hearing

Lastly, defendant argues he is entitled to a youth offender parole hearing under *People v. Hardin* (2022) 84 Cal.App.5th 273, review granted, January 11, 2023, S277487 (*Hardin*), because the distinctions drawn in section 3051 violate equal protection. The People argue section 3051 has a rational basis, *Hardin* was wrongly decided, and this court should follow the other Courts of Appeal which have rejected the type of equal protection argument advanced in *Hardin*. For the reasons that follow, we agree with the People.

An equal protection challenge proceeds in two stages. First, we must determine whether the two groups to be compared are similarly situated for the purposes of the

27.

statute in question. (*Hardin*, *supra*, 84 Cal.App.5th at p. 283.) "If the groups are similarly situated, the next question is whether the disparate treatment can be justified by a constitutionally sufficient state interest." (*Conservatorship of Eric B.* (2022) 12 Cal.5th 1085, 1102.) This requires determining the correct level of scrutiny: strict, intermediate, or rational basis. (See *People v. Wilkinson* (2004) 33 Cal.4th 821, 836; *People v. Cavallaro* (2009) 178 Cal.App.4th 103, 111, fn. 9.) All parties agree rational basis is the appropriate standard of scrutiny here, and we concur.

Under rational basis review, "we consider whether the challenged classification ultimately bears a rational relationship to a legitimate state purpose." (*People v. Chatman* (2018) 4 Cal.5th 277, 289.) Rational basis review requires we " 'accept any gross generalizations and rough accommodations that the Legislature seems to have made.' " (*Johnson v. Department of Justice* (2015) 60 Cal.4th 871, 887.) " 'A classification is not arbitrary or irrational simply because there is an "imperfect fit between means and ends" ' [citation], or 'because it may be "to some extent both underinclusive and overinclusive." ' " (*Ibid*.) Equal protection "allows not only *incremental* regulation, but also *incomplete* regulation." (*People v. Ngo* (2023) 89 Cal.App.5th 116, 126, review granted May 17, 2023, S279458.)

*Hardin* concerned statutory revisions to parole eligibility for certain youthful offenders under sections 3051 and 4801, subdivision (c), following various cases stemming from *Roper v. Simmons* (2005) 543 U.S. 551. (*Hardin*, *supra*, 84 Cal.App.5th at p. 280.) In particular, the U.S. Supreme Court in *Miller v. Alabama* (2012) 567 U.S. 460 determined the Eighth Amendment's prohibition on cruel and unusual punishment prevents the imposition of a mandatory life without parole ("LWOP") sentence for those under the age of 18 at the time of their crimes. (*Miller v. Alabama*, at p. 479.) The Supreme Court later concluded *Miller* announced a new "substantive rule of constitutional law," and therefore was retroactive in its application. (*Montgomery v. Louisiana* (2016) 577 U.S. 190, 212.) Additionally, the California Supreme Court ruled

shortly after *Miller* that a sentence on a juvenile which was the "functional equivalent of a life without parole sentence" could not withstand scrutiny under the Eighth Amendment either. (*People v. Caballero* (2012) 55 Cal.4th 262, 268, fn. omitted.) The revisions found in sections 3051 and 4801 were thus made to attempt to conform California sentencing law with these constitutional holdings. (*Hardin*, at pp. 280–281.)

Under the revised sentencing schema, a person convicted of a controlling offense[12] who was 25 years of age or younger at the time of the crime, and was sentenced to an indeterminate life term, i.e., a life term with parole eligibility, is entitled to a youth offender parole hearing during the 25th year of incarceration. (§ 3051, subd. (b)(3).) A person sentenced to LWOP who was younger than 18 years of age at the time the controlling offense was committed is now also eligible for a youth offender parole hearing during their 25th year of incarceration. (§ 3051, subd. (b)(4).) However, an individual older than 18 years of age who was sentenced to LWOP is not afforded a youth offender parole hearing under the revised statute. (§ 3051, subd. (h).)

The *Hardin* court focused its consideration on the equal protection challenge to the difference between the first and last of those above: between individuals over 18 years old sentenced to an indeterminate life term, who receive a youth offender parole hearing, and individuals over 18 years of age who received an LWOP sentence and thus were not permitted a youth offender parole hearing. (*Hardin*, *supra*, 84 Cal.App.5th at p. 286.) It concluded the two groups were "similarly situated" for the purposes of equal protection analysis, a conclusion with which we likely agree. (*Id.* at p. 287.) However, it then went on to conclude there was no rational basis for distinguishing between young adult offenders sentenced to LWOP and young adult offenders receiving lesser sentences. (*Id.* at p. 288.) With this latter conclusion, we disagree.

---

[12] "Controlling offense" means "the offense or enhancement for which any sentencing court imposed the longest term of imprisonment." (§ 3051, subd. (a)(2)(B).)

It is not irrational for the Legislature to conclude those convicted of crimes for which LWOP is a possible sentence – which are, mainly, special circumstance murders (see § 190.2, subd. (a)) – run a higher risk of recidivism, are more worthy of punishment, or "are especially indicative of incorrigibility so as to not warrant a parole hearing." (*People v. Bolanos* (2023) 87 Cal.App.5th 1069, 1080, review granted Apr. 12, 2023, S278803, fn. omitted.)[13] Further, the Legislature may have wished to choose a bright line for determining which offenders receive youth offender parole hearings, since it presumably enacted this legislation largely to insulate already-passed sentences from invalidation and resentencing under *Miller*, *Montgomery*, and *Caballero*. (See *People v. Ngo*, *supra*, 89 Cal.App.5th at p. 126 ["[U]sing a special circumstance as a bright-line test of culpability is well-established"].) All of these are rational bases for the Legislature's enactment of the law in the manner it did, which is all that is required to uphold the constitutionality of a statute against a rational basis equal protection challenge. This conclusion is not new or novel amongst the Courts of Appeal, and most, save the *Hardin* court, have found the law to be rationally related to a legitimate state interest. (See *People v. Bolanos*, at p. 1080; *People v. Ngo*, at p. 126; *People v. Sands* (2021) 70 Cal.App.5th 193, 204; *People v. Morales* (2021) 67 Cal.App.5th 326, 347; *People v. Jackson* (2021) 61 Cal.App.5th 189, 199; *People v. Acosta* (2021) 60 Cal.App.5th 769, 780; *In re Williams* (2020) 57 Cal.App.5th 427, 436.)

Ultimately, we agree with the People, pending review of this question by our Supreme Court. There is a rational basis to distinguish between individuals 25 years of age and younger sentenced to LWOP and individuals 25 years of age and younger

---

[13] The Legislature also excluded certain other felons sentenced under the "Three Strikes" and "One Strike" laws. (§ 3051, subd. (h).) Certain other crimes, including repeated aggravated sexual assault crimes against minors under the age of 14, also carry a sentence of life without the possibility of parole. (§ 667.61, subd. (j)(1).)

sentenced to a parole eligible crime.  That basis is in the statute itself:  the severity of the controlling offense at issue.

## **DISPOSITION**

For the reasons given above, defendant's conviction is affirmed.


POOCHIGIAN, Acting P. J.

WE CONCUR:


SNAUFFER, J.


DE SANTOS, J.